FEDER, NUSBAUM & CO., PLAINTIFFS IN ERROR, V. SOL-
OMON & NATHAN, DEFENDANTS IN ERROR.

[FILED APRIL 11, 1889.]

**Attachment:** Defendants in error, having met with a heavy loss by fire, were unable to meet their obligations, and having executed chattel mortgages upon their stock of merchandise in favor of a bank and others, plaintiffs in error procured an attachment and attached said stock, alleging in the affidavit therefor, that "defendants are about to sell, convey and otherwise dispose of their property, with the fraudulent intent to defraud and cheat their creditors, and to hinder and delay them in the collection of their debts, and have sold, conveyed, and otherwise disposed of their property, with the fraudulent intent to cheat and defraud their creditors, and to hinder and delay them in the collection of their debts." Upon their motion to dissolve the attachment, heard before the district judge at chambers, the questions were: (1) Whether there was an immediate delivery of the goods to the mortgagee, under the mortgage to the bank, followed by a continued change of possession. (2) Whether said mortgage was made in good faith, and not for the purpose of hindering or de-

laying creditors. *Held,* That such questions are questions of fact; and that the decision of said judge upon said motion being sustained by sufficient evidence, it will be upheld.

ERROR to the district court for Cass county. Tried below before CHAPMAN, J.

*Montgomery & Jeffrey,* for plaintiff in error, cited: *Robison v. Uhl,* 6 Neb. 328; *Brunswick v. McClay,* 7 Id. 137; *Turner, Frazer & Co. v. Killian,* 12 Id. 580; *Severance v. Leavitt,* 16 Id. 439; *Currie et al. v. Knight et al.,* 34 N. J. Eq. 485; *Wallen jr. v. Rossman, Sheriff,* 45 Mich. 333; *Fearey v. Cummings,* 41 Id. 376; *Hedman v. Anderson,* 6 Neb. 392; *Doyle v. Stevens,* 4 Mich. 87; Bump on Fraudulent Conveyances, 3d Ed., 136; *Densmore v. Tomer,* 14 Neb. 393; *Doyle v. Stevens,* 4 Mich. 87; *Cahoon v. Marshall,* 25 Cal. 201; *Billingsley v. White,* 59 Pa. St. 464; *Cutting v. Jackson,* 56 N. H. 253; *Mead v. Noyes,* 44 Conn. 487.

*M. A. Hartigan,* for defendant in error, cited: *Morrow v. Reed,* 30 Wis. 81; *Janvrin v. Fogg,* 49 N. H. 340; Jones on Chattel Mortgages, secs. 176, 190, 336; *Thash v. Norment,* 5 Mo. Appeals, 545; Bump on Fraudulent Conveyances, 3d Ed., p. 603; Waples on Attachments, pp. 425, 426, 427, 428, and authorities cited; *Seidentopf v. Annabil,* 6 Neb. 524; *People v. McAllister,* 19 Mich. 215, 217.

COBB, J.

On the 10th day of May, 1888, the plaintiffs in error commenced an action in the district court of Cass county, to recover from the defendants in error the sum of $933 upon an account for merchandise sold and delivered, upon which account the sum of $425 was, at the commencement of the action, past due, and the sum of $508 was to become due on the 15th day of May, 1888. At the same time the plaintiffs in error filed in said action an affidavit

for an attachment, alleging, as their grounds therefor, that defendants "have sold, conveyed, and otherwise disposed of their property, with the fraudulent intent to cheat and defraud their creditors, and to hinder and delay them in the collection of their debts; and that said defendants are about to sell, convey, and otherwise dispose of their property, with the fraudulent intent to cheat and defraud their creditors, and to hinder and delay them in the collection of their debts."

On the 9th day of August, 1888, the defendants in error filed their motion to vacate the plaintiff's order of attachment, and discharge the same for the reasons:

1. That the court had no jurisdiction to make the order from the records presented.

2. That the affidavit on which the order was granted, states no fact or facts justifying an order of attachment.

3. That there was no bond given as required by law, the indebtedness shown as $933 and the bond for $1,666.

4. That the order of attachment was improvidently granted.

5. That the allegations of the affidavit, on which the attachment was sought, are false and untrue.

6. That at the date of the suing out of the attachment, the plaintiffs had already commenced, and there was pending, an action between the parties for the recovery of the same indebtedness upon which orders of attachment had been issued and lands seised, in the district court of Smith county, in the state of Kansas, sufficient to pay the debt, which action is still pending and in no manner released.

On the 22d day of August following, this motion was argued and heard before the district judge of Cass county, and it was ordered that the attachment heretofore granted be vacated and discharged, and the sheriff ordered to return all the property taken under the attachment, and the garnishee released from all liability in this action.

To the order of the court sustaining the motion and dis-

charging and vacating the attachment and order of garnishment, the plaintiffs except, and bring the cause to this court on the following assignments of error:

1. The court erred in sustaining the motion to discharge the attachment.

2. In ordering that said attachment be vacated and discharged.

3. The order vacating and discharging said attachment is not sustained by the affidavits filed to support the same..

The first, second, third, and fourth grounds of defendants' motion, on which the plaintiffs' order of attachment was dissolved, was doubtless abandoned before the district judge. The third was based upon a mistake of fact, the ground of objection therein against the bond being untrue..

As to the sixth ground of objection, without expressing an opinion upon the point, I deem it sufficient to say that the evidence introduced to establish it, fails to show that the proceedings in Smith county, Kansas, had been commenced or were pending at the time of the commencement of these proceedings here sought to be dismissed.

The fifth point was the only one argued at the bar of this court, and to it our discussion will be confined.

The allegations of the affidavit for attachment, called in question and put in issue by the fifth ground of the motion, are that the defendants are about to sell, convey, and otherwise dispose of their property, with the fraudulent intent to defraud and cheat their creditors, and to hinder and delay them in the collection of their debts, and have sold, conveyed, and otherwise disposed of their property, with the fraudulent intent to cheat and defraud their creditors, and to hinder and delay them in the collection of their debts.

It is not contended by the plaintiffs in the argument that the defendants were about to make, or contemplated making, any other or further disposition of their property than that which they had already made by the execution of the chattel mortgages.

Our attention will therefore be confined to the legal effect. of the chattel mortgages previously executed, and placed on file on the day previous to that on which the order of attachment was issued. Was that disposition fraudulent, and made by the defendants with intent to cheat and defraud their creditors, and to hinder and delay them in the collection of their debts? Much of the argument of the plaintiffs, in their brief, is directed to the character and legal effect of the disposition of the goods by these chattel mortgages, considering the transaction before the recording of the mortgages. I do not consider it necessary to follow this part of the argument, for it is admitted that before the commencement of the action, before the filing of the affidavit, and before the allowance and issuance of the order of attachment, the mortgages had been placed on file.

The case therefore does not come within the provision of section 14, chapter 32, of the Compiled Statutes, but must be construed in reference to the provisions of section 11 of said chapter, that: "Every sale made by a vendor, of goods and chattels in his possession or under his control, and every assignment of goods and chattels by way of mortgage or security, or upon any condition whatever, unless the same be accompanied by an immediate delivery, and be followed by an actual and continued change of possession of the things sold, mortgaged, or assigned, shall be presumed to be fraudulent and void as against the creditors of the vendor, or the creditors of the person making such assignment, or subsequent purchasers in good faith; and shall be conclusive evidence of fraud; unless it shall be made to appear on the part of the persons claiming under such sale or assignment, that the same was made in good faith, and without any intent to defraud such creditors or purchasers."

The question is, therefore, whether the sale or assignment of said goods and chattels by way of mortgage or security, was accompanied by an immediate delivery and followed by an actual and continued change of possession of the

things sold, mortgaged, and assigned, or whether it was made to appear at the hearing of said motion that the same was made in good faith without any intention to defraud the creditors of the defendants. If upon the execution and delivery of said chattel mortgages the same was accompanied by immediate delivery, and followed by an actual and continuous change of possession of the mortgaged property, such mortgage and transfer must be presumed to have been made in good faith, and the burden of proving it to have been made with fraudulent intent rests upon the plaintiffs. But if there was no such immediate delivery followed by an actual and continued change of possession, it was incumbent on the defendants or those claiming under such sale or assignment to make it appear that the same was made in good faith and without intent to defraud the creditors of the defendants.

The evidence presented to the district judge upon the hearing of the motion to dissolve the attachment, was directed primarily to the question of the immediate delivery and the actual and continued change of possession of the goods, but might have been, and probably was, considered by him also as bearing upon the question, whether the sale or assignment was made in good faith, and without any intent to defraud any of the creditors.

The defendants presented the affidavit of the defendant Isaac Nathan. In this testimony, the affiant, after setting forth facts and circumstances concerning the defendants' business at the city of Plattsmouth, and at the town of Fairmont, states that their losses by fire at Fairmont amounted to $30,000, on which there was an insurance of $10,000, and no more; that their stock of goods at Plattsmouth amounted to about $12,000, which, with the amount of the insurance on that lost by fire, constituted their only available assets to meet an indebtedness of $33,000; that their creditors, becoming alarmed, began to urge an immediate settlement and payment; that among

their creditors was the First National Bank of Plattsmouth, and to secure said bank, their firm made and delivered its notes and mortgage to cover the amount due of $5,000; that among the servants and clerks who had served the firm honestly and faithfully for more than ten years, was James Finley, to whom they made and delivered their mortgage in good faith for full value in the sum of $500; that among those who had loaned and advanced money to the firm were Fannie Nathan and Lee Sanders, to whom were executed mortgages in good faith and for full value; that after the execution of the mortgage to the bank, its officers demanded, as a precaution, possession of the stock of goods so mortgaged, and affiant gave them possession, and they proceeded to sell the same and apply the proceeds to the liquidation of their claims; that the same was done in good faith to pay and discharge a just indebtedness. Affiant says, in conclusion, that he, nor any person for his firm, never intended nor attempted nor has he nor they ever entertained an intent or purpose to sell, convey, or otherwise disposed of their property, with fraudulent intent to cheat or defraud their creditors, nor to hinder or delay the collection of their debts; and that they have not sold, conveyed, nor otherwise disposed of their property, with fraudulent intent to cheat or defraud their creditors, nor to hinder or delay them in the collection of debts.

They also presented the affidavit of M. A. Hartigan, who testified that he was well acquainted with the defendants, as the First National Bank of Plattsmouth, for which affiant had been the attorney; that about the time the mortgages given by defendants bear date, Mr. Waugh, an officer of the bank, came to affiant and informed him that defendants were in financial trouble; that by reason of the fire at Fairmont, they had been crippled financially; that they were in debt to the bank; and wished affiant to secure the claim, and to act promptly, which affiant proceeded to do; that affiant went to Mr. Nathan, the other partner, Solomon, being

away from home, sick.   He hesitated, and refused to do anything unless he could treat all the creditors alike.   Affiant urged the fact that the bank's relations were unlike that of other creditors, without the profits in other lines of business; that Mr. Nathan admitted this was true, but that he would rather prefer the persons who had worked for the firm for years, and in good faith had left their earnings in the business of the firm ; that Mr. Nathan finally concluded to give, and did give, the mortgage to the bank, and at the same time made the other mortgages.   Affiant then suggested to the officers of the bank to take charge of the stock and proceed to sell at once and save expenses, rent, and loss on goods by reason of the change in season, and after such consultation it was decided to have Mr. Finley, if he could be secured, take charge of the stock, invoice it, and place suitable help with him, among whom was P. P. Gass, and sell and apply the returns upon the notes.   This was done, and as the goods were sold the money was credited. Affiant says he saw the notice sworn to by D. C. McEntee.   It was at the cashier's desk, and affiant advised that it should be so done to invite purchasers, and the payment of cash for goods sold and purchased.   Affiant says he was present when Mr. Waugh, the cashier, employed Mr. Finley and gave him the keys ;  that his salary was fixed at $100 per month, and that he should have such help as he wished; that affiant advised the bank and Mr. Finley to sell as appears by the circular exhibited by the affidavit of C. W. Sherman.   Affiant further stated that Mr. Nathan was present in the store to collect accounts due the firm, receive and answer mail, and to meet the traveling men for the houses from which they had been buying goods; that Nathan had been at their place of business a good deal since the mortgages were made, but that he paid but little attention to the sale of goods ;  that Finley was the man who did and directed all business in and about the store.

They also presented the affidavit of James Finley, who

testified that he had been in the employ of the firm of Solomon & Nathan, in Plattsmouth, about eleven years; that he is the party to whom the defendants executed a mortgage for wages due him, of $500; that he was the confidential clerk of said firm; that at the time of making and delivery of the mortgage to him, the defendants were indebted to him in said sum for work and labor done and for wages earned before that time; that in giving the mortgage to him, there was no effort, desire, nor purpose, to delay or defraud any one; that he remembers the giving of the mortgage to the First National Bank of Plattsmouth. M. A. Hartigan was the bank's attorney who came with its claim and urged the payment of the bank, which had loaned the money, and in many ways, in years gone by, had assisted the defendants. Mr. Nathan said they would give up every dollar to save their name and credit. Mr. Waugh and Mr. Hartigan said they must realize on the stock as soon as possible, and requested affiant to take charge of the store and stock, and gave affiant one of the keys, the other being left with the bank until August 15, when the claim of the bank was satisfied and the mortgage discharged of record, the notes given up and the keys returned. During the time affiant held said stock, Mr. Nathan was about the store seeking to collect the outstanding claims due the firm, and gave affiant such advice as would best secure the interest of the bank mortgages first, and then that of affiant and the others. Affiant says there was no purpose to delay nor hinder any other creditor in giving said mortgages; that they were for *bona fide* debts, the main consideration being money advanced by the bank, and work and labor done and rendered by affiant and others. Affiant further stated that the position of P. P. Gass was only that of cashier put in the store at request of affiant, and that he had no other duty to perform than to take and keep an accurate account of the money from sales, and return the same to the bank, which he undertook to do.

At the time affiant took charge of the stock, Mr. Waugh agreed to pay him $100 per month for his services during the time he acted for the bank; and affiant states, in conclusion, that there was a general understanding in Plattsmouth that he was selling under a mortgage, that this was an inducement to buy, and in many instances sales were effected thereby.

The affidavit of David McEntee states that he is an employé of the First National Bank of Plattsmouth; that on the next morning after the date of the mortgage by Solomon & Nathan to the said bank, he was placed in charge of the stock of goods by and for the bank, with James Finley, the former clerk of the firm; that affiant prepared a notice that "this store and stock is in the hands of mortgagees," and placed it where it could be seen by any one approaching the cashier's desk. The stock was in affiant's charge until Mr. Gass was placed in the store; the keys were given to affiant, who held them while in the store, and afterwards were in the bank until August 15.

On the other hand, the plaintiffs presented to said district judge, at said hearing, on their part, the affidavit of Eugene Montgomery Esq., of the law firm of Montgomery & Jeffrey, of Omaha, the resident attorneys of the plaintiffs, stating that on May 8, 1888, his firm received a dispatch from Moses & Newman, attorneys at law, of Chicago, the residence of the plaintiffs, instructing affiant's firm to go at once to Plattsmouth, to look after the plaintiffs' claim for goods and merchandise, sold to defendants, amounting to $934.33. On May 9th, affiant went to Plattsmouth and sought out defendants at their place of business; saw the defendant Nathan, who, from all appearances, was in charge of the business, without any evidence or indication that defendants were not then in possession of said stock of goods and selling the same in their own interests, in the usual course of business, though affiant carefully noted the surroundings for the purpose of determining, without special

inquiry, as to who was in possession. After interviewing Mr. Nathan, and being satisfied that there were good grounds therefor, affiant at once prepared the necessary papers and commenced an action for the recovery of the amount for which defendants were indebted to the plaintiffs, and also for the suing out of a writ of attachment therein. He telegraphed to the plaintiffs' attorneys at Chicago for an attachment bond, but not being able to secure the same until the next day, May 10, did not commence the action until then; that late in the afternoon of the 9th of May affiant examined the records and files of the clerk of Cass county to see if defendants had conveyed, by mortgage or otherwise, to any one, their stock of goods and merchandise in Plattsmouth, but found no conveyance of any kind then on file; that on the next day, when this action was commenced, he again examined the clerk's records and files, and found filed therein late in the afternoon of May 9, 1888, three chattel mortgages by defendants upon said stock of goods and merchandise belonging to them, all of which mortgages were dated April 17, 1888, the first to the First National Bank of Plattsmouth, for $5,000, the second to James Finley, for $500, and the third to Fanny Nathan, Lee Sanders, and Simon Seelig, jointly, for $5,500, to secure a note for $2,500 in favor of Fanny Nathan, a note for $2,000 in favor of Lee Sanders, and one for $1,000 in favor of Simon Seelig; that the reason copies of said mortgages are not exhibited herewith is because they were released upon the records and taken from the clerk's office on the 10th day of August, 1888, and affiant is now unable to obtain copies thereof.

Affiant says that he remained in Plattsmouth throughout the day of May 10; that at frequent intervals he passed and repassed the store building wherein defendants had their stock of goods mortgaged as mentioned, and where they were doing business; that he frequently stopped at the door and carefully noted the condition of things therein

and thereabout; saw people going in and out; saw Mr. Nathan there, receiving customers as theretofore, and their wants attended to by the same clerks; but at no time saw any sign or indication that defendants had delivered up possession of said store and their stock of merchandise to the First National Bank of Plattsmouth, or to any other person, company, or corporation. Affiant, by careful observation, saw no notice in the window, nor anywhere, informing the public generally that defendants' possession of said store had ceased; but from all appearances, within and without, and by the signboards of defendants still hung up conspicuously, a careful observer could not but conclude that defendants' business was conducted by themselves as before the filing of the mortgages mentioned; and that said defendants were in open possession of said stock of goods and merchandise; that again, on May 18, 1888, affiant was at Plattsmouth throughout the day; that at frequent intervals on that day he passed and repassed the same store building where defendants had always conducted their business; that he frequently stopped at the entrance and noted every sign and indication within and without which would in any manner indicate who was in possession thereof, and who was conducting said business, and as before he noticed the said Mr. Nathan receiving customers and the old clerks attending to their wants, and as before no notices were posted up in the windows, nor in and about said store, to inform the general public that others instead of the said defendants were in possession and conducting the business, nor was there any evidence whatever that the First National Bank of Plattsmouth, or any other person except defendants, were in possession and selling the stock of goods and merchandise mortgaged as aforesaid.

Also the affidavit of William L. Brown, who states that he is an attorney at law, and has resided at Plattsmouth since November 1887; that he knows the storeroom where the defendants conducted their mercantile business in Platts-

mouth; that up to the commencement of this action he had never seen any sign nor indication in, about, nor around, said store evidencing in any way that the possession of the stock of goods therein was in any person, company, or corporation, other than the defendants; that since the commencement of this action he has taken particular pains to note the appearances in and about said store, for the purpose of discovering if there had been an actual change of possession of said store and its contents of merchandise; that he has never observed any signs, handbills, advertisements, or notices of any kind about said store or posted in the windows, informing the public that the defendants had delivered possession of the store and its contents to any one else, or hinting in any manner that any other person than the defendants were in possession; that soon after the commencement of this action he had conversations at different times with Mr. Nathan within defendant's store, and occasionally noticed one P. P. Gass in and about the store; that said Nathan told affiant that said Gass was there for the First National Bank of Plattsmouth, "to see how things were running," but that affiant would not have known why said Gass was around the store except for the information thus volunteered, or for what Gass himself might have told him; that Gass exercised no control in the conduct of the business, so far as affiant observed, but, on the contrary, that Nathan and his clerks attended to the selling of all goods, the same as though the bank was not represented.

Also the affidavit of P. P. Gass: That he is a resident of Plattsmouth; that on May 12, 1888, he was employed to represent the First National Bank as its agent in taking charge of the receipts of sales of the stock of goods and merchandise mortgaged by defendants; that in that capacity and for that purpose he attended the store daily where the stock was kept, except when the store was not kept open, until July 13, 1888, when his employment ended; that he did not have the keys to the store doors, but

the same remained in possession of defendants; that affiant gave no personal attention to nor did he direct the sales of merchandise, but the business was directed and ordered either by Mr. Nathan, of the defendant's firm, or by one of his principal clerks; that during affiant's employment as aforesaid, he was the only representative of said First National Bank in and about the store-room where the mercantile business of defendants was conducted.

Also the affidavit of Exa Bee Critchfield, the deputy clerk of Cass county, that the index of chattel mortgages in her office shows that on May 9, 1888, three chattel mortgages were filed, given by Solomon & Nathan on their stock of goods and merchandise in Plattsmouth; the first to the First National Bank of Plattsmouth for $5,000, the second to James Finley, for $500; and the third to Fanny Nathan, Lee Sanders, and Simon Seelig, jointly, for $5,500, all of which were dated April 17, 1888; that the same were, on August 10, 1888, released upon the index of chattel mortgages, and the instruments themselves lifted.

Also the affidavit of C. W. Sherman, stating that he is one of the proprietors of the *Plattsmouth Journal*; that on July 26, 1888, at the request of Mr. Nathan, of the firm of Solomon & Nathan, there was printed the following advertisement: "Farewell. Great closing-out sale. On account of the death of Mr. Solomon, and the settlement of the estate being necessary, September 1, 1888, will terminate our business career of nineteen consecutive years in the city of Plattsmouth.

"We herewith extend to our many friends our sincere thanks for their generous patronage during these many years, and we now propose to give our *farewell bargain sale*.

"We accordingly offer our entire stock of dry goods, millinery, carpets, rugs, oil cloths, mats, crumb cloths, ladies', misses', and children's cloaks and winter wraps, plush garments, blankets, flannels, yarns, black and colored g. g.

silks, velvets, plushes, jewelry, trunks and valises, parasols, fans, corsets, laces, shawls, hosiery, staples, and countless articles usually contained in a first-class dry goods house, *at prices that will render the packing and shipment of any goods impossible. This sale is limited,* commencing at once and ending August 31. The time is short; do not delay. All goods sold for cash only. All accounts due us must be settled by August 15, 1888. I. Nathan, surviving partner of the firm of Solomon & Nathan."

There were also before the district judge, as a part of the record in the case, the affidavits of Eugene Montgomery, made as one of the attorneys for the plaintiffs, in one of which he stated that he had "good reason to believe, and does believe, that the First National Bank of Plattsmouth, Nebraska, has property of the defendants in its possession, to wit: certain dry goods, notions, millinery stock, and other property to the affiant unknown;" and in the other of which it is also stated that he has "good reason to believe, and does believe, that James Finley, Fanny Nathan, Lee Sanders, and Simon Seelig, have property of the defendants in their possession, to wit, a stock of goods, the nature and extent of which are to the plaintiffs unknown."

Section 20 of the chapter above cited provides: "That the question of fraudulent intent arising in all cases under the provision of this chapter shall be deemed a question of fact and not of law." * * *

As we have seen, there were two questions before the district judge for his determination — one as to the immediate delivery and continued change of possession of the mortgaged property, and the other as to the good faith of the transaction — both of which are essentially questions of fact, and either one of which, if held to be in favor of defendants, is conclusive of the case.

The testimony of Montgomery as to the situation of the defendants' affairs at their store in Plattsmouth, at or about the time of issuing the order of attachment, constitutes the

·chief evidence tending to disprove the evidence on the part ·of defendants that the possession of the store and the goods had passed to the bank and was held by its officers and ·agents. The effect of this evidence must have been materially weakened, if not wholly destroyed, by his affidavits last above referred to, in which he seeks to charge the bank, ·as well as the other parties therein mentioned, with the possession on that day of this identical property. This could not well fail to convince the district judge that even this most important witness for the plaintiffs was not only in ·doubt as to who was in possession of the property, but really believed that the bank was in such possession.

I will not comment upon the above evidence further than to say that I think there is sufficient to uphold the district judge, and follow the rule so often laid down and maintained that the finding of questions of fact by a trial court or jury will not be reversed where the evidence is conflicting, unless clearly wrong or manifestly unjust.

The order of the district judge will be affirmed.

JUDGMENT ACCORDINGLY.

THE other Judges concur.