E. B. BACON ET AL., APPELLEES, V. P. BROCKMAN COMMIS-
SION COMPANY, APPELLANT ET AL., APPELLEES.

FILED MAY 6, 1896.   No. 6537.

Fraudulent Conveyances: CHATTEL MORTGAGES. A chattel mortgage
    which covered all the property of an insolvent debtor, executed
    under an agreement between the parties thereto that the mort-
    gage should not be filed for record, that the mortgagee should
    take formal possession of the mortgaged property and hold pos-
    session thereof for the benefit and subject to the direction of the
    mortgagor until by sale or lease of the mortgaged property to the
    advantage of the mortgagor the debt secured should be paid, and
    then account to the mortgagor for the balance, *held* fraudulent as
    to other creditors of the mortgagor who are plaintiffs in this
    action.

APPEAL from the district court of Gage county. Heard
below before BABCOCK, J.

*Hall & McCulloch,* for appellant.

*John D. Howe, E. R. Duffie,* and *James McNeny, contra.*

RYAN, C.

This action was begun April 28, 1892, in the district
court of Gage county by the partnership firm of E. P.
Bacon & Co. Subsequently, by intervention, the Citizens
State Bank of Council Bluffs, Iowa, became a party
plaintiff. The Brown Bros. Grain Company, a corpora-
tion organized under the laws of the state of Nebraska,
was made a defendant because it was largely indebted
to each of the plaintiffs. Between the parties already
named there was in this case no controversy. Between
the original plaintiff and the intervenor, on the one hand,
and the P. Brockman Commission Company, a Missouri
corporation doing business at St. Louis, on the other
hand, there was a real closely contested dispute. Each
petition was in the nature of a creditor's bill containing
averments necessary to show the existence of an indebt-

edness due from the Brown Bros. Grain Company, evi-
denced by a judgment in favor of the plaintiff and the
intervenor respectively, the issue and return of execution
"no property found," and the subsequent levy upon the
property sought to be subjected to the payment of said
judgments. In addition to the averments indicated,
these petitions, in apt language, sufficiently described the
transactions of which complaint was made, charged that
they were fraudulent, and prayed appropriate relief. The
subsequently filed pleadings fully presented the issues
under which the evidence was introduced, so that it is not
necessary to describe at greater length these pleadings.
There was a decree in favor of the plaintiff and the inter-
venor, and therefrom the P. Brockman Commission Com-
pany has prosecuted this appeal.

The Brown Bros. Grain Company was incorporated in
the year 1890 and continued in the business of buying,
selling, and shipping grain until the latter part of the
year 1891. This firm owned eleven elevators in Ne-
braska and two in Kansas, and had a five years' lease of
the Union Elevator at Council Bluffs, Iowa. The ele-
vators in Nebraska and Kansas were built and stood on
the right of way of the Union Pacific railway, or of
its branches. About July 20, 1891, the Brown Bros.
Grain Company made a shipment of grain to the P.
Brockman Commission Company at St. Louis, and against
said shipment drew a draft of $300. This was paid and
thereafter there were other consignments and other
drafts, until in September, 1891, the Brown Bros. Grain
Company was indebted to the P. Brockman Commission
Company in the sum of $67,580.85, and, after having been
increased to over $84,000 in the meantime, this indebted-
ness, in November of the same year, was reduced to $68,-
479.11. On the 14th day of the month last named P.
Brockman, the president of the P. Brockman Commission
Company, made an arrangement with the Brown Bros.
Grain Company whereby was procured to be executed a
chattel mortgage. Mr. Brockman in making this ar-

rangement had, it seems, full authority to represent the company of which he was president. The chattel mortgage above referred to was not easily procured, and finally was given only on condition that certain memoranda of agreements should be contemporaneously executed by the mortgagee. Practically, this mortgage covered all the property of the mortgagor, including its accounts, notes, and demands of every kind. The conditions contained in the mortgage were as follows: "Now if the said Brown Bros. Grain Company shall well and truly pay, or cause to be paid, all of said notes, checks, bills of exchange, open accounts, and other indebtedness above described, to the said P. Brockman Commission Company, when the same shall become due and payable, then this obligation shall be void, but in case the said Brown Bros. Grain Company shall not pay the same when they become due and payable, or any part thereof, then the said P. Brockman Commission Company shall have the right to take immediate possession of the same, and to sell the same either at public or private sale, as it, said corporation, shall elect, notice of said sale and publication thereof being hereby expressly waived, and, after paying the expenses of the said sale, and any amount which may be due the said P. Brockman Commission Company, the said P. Brockman Commission Company shall render the surplus, if any, to the said Brown Bros. Grain Company." Contemporaneously with the making of the above mortgage, there were executed three memoranda, which, under their respective headings, "A," "B," and "C," were as follows:

"A."

"This memoranda witnesseth, that whereas, Brown Bros. Elevator Company have this day turned over to P. Brockman Commission Company, of St. Louis, by mortgage indenture of this date, their lease of elevator in Council Bluffs, and all their elevators on the line of the Union Pacific and its branches in Nebraska and Kansas, being elevators at Raymond, Lincoln, Beatrice, Prince-

ton, Hamlin, Jamaica, Blue Springs, Pickerell, Cortland, Holmesville, Barneston, in Nebraska, and Oketo and Hull, in Kansas:

"Now, therefore, it is understood and agreed by the P. Brockman Commission Company, of St. Louis, Missouri, that they will continue to operate all of such elevators now operated until the same can be disposed of, by lease or sale, to the advantage of said grain company, accounting to said Brown Bros. Grain Company for whatever profits there may be over and above all costs and expenses, interest, and indebtedness for running the same.

"Dated this 14th day of November, 1891.

"BROCKMAN COMMISSION COMPANY,

"Per P. BROCKMAN."

"B."

"Whereas, Brown Bros. Grain Company has heretofore caused certain grain to be shipped on the line of the Union Pacific Railway Company, on its bills of lading duly issued therefor, consigned to the care of the Union Elevator of Council Bluffs, Iowa, which said Union Elevator has been in the possession of and operated by the said Brown Bros. Grain Company; and

"Whereas, the said Brown Bros. Grain Company has secured the delivery of large shipments of said grain to said elevator so operated by it, without producing or surrendering to the said Union Pacific Railway Company the bills of lading therefor, by reason of which fact there are now outstanding a large number of bills of lading as against the said railway company, for grain which has actually been delivered to said elevator company; and

"Whereas, the undersigned is a large creditor of the Brown Bros. Grain Company, and it is important that the undersigned should secure possession of the said Union Elevator at Council Bluffs, Iowa, and should secure a transfer, assignment of sale of the grain, and other properties now in possession of Brown Bros. Grain Company at the said elevator, and in certain other elevators now operated by it in the state of Nebraska; and,

"Whereas, the said Union Pacific Railway Company has assisted the undersigned in securing possession of the said elevator and in negotiating a proper transfer of the properties of said Brown Bros. Grain Company, for the purpose of securing the undersigned:

"Now, therefore, in consideration of the premises, the undersigned hereby promises and agrees to and with the said Union Pacific Railway Company, that all of the grain received from the said Brown Bros. Grain Company and now stored in the Union Elevator at Council Bluffs, Iowa, so far as the same can lawfully be applied for such purpose, shall be applied to the cancellation and satisfaction of all outstanding bills of lading of the Union Pacific Railway Company for grain delivered at such elevator in Council Bluffs, it being expressly understood that those bills of lading now in the hands of the undersigned shall be first satisfied, and that thereafter other bills of lading so outstanding shall be satisfied in the order of their presentation, it being the purpose of this agreement to guaranty and protect the said railway company from all loss arising from any outstanding bills of lading therefor, so far as the said grain now in said elevator will suffice for that purpose.

"P. BROCKMAN COMMISSION COMPANY,

"Per P. BROCKMAN, *Pt.*"

"C."

"It is agreed by P. Brockman Commission Company that it will protect all drafts against grain en route for the elevator now drawn, not exceeding $16,800.

"P. BROCKMAN COMMISSION COMPANY,

"Per P. BROCKMAN, *Prest.*"

Appellant insists that the above described mortgage, and the written contracts made contemporaneously therewith, constitute the sole admissible evidence of the transactions therein referred to. As between the parties to these written instruments this doubtless would have been the general rule, but this action was not one predicated upon the memoranda nor between the parties. It was

rather a proceeding in which this whole transaction was assailed as fraudulent and void as against the rights of the complaining parties, and its purpose was to obtain the judgment of the court to that effect. Whatever evidence was competent and relevant for the purpose indicated was admissible, and from an attack of this character the written memoranda could claim no special immunity.

On Sunday, the 8th day of November, 1891, P. Brockman, representing the P. Brockman Commission Company, made an examination of the books of the Brown Bros. Grain Company, and with expressions of approval of the showing thereby made, offered to furnish whatever money was necessary for carrying on the business, provided security was given for what was already owing, and for further advances. During the remainder of the week preceding Saturday there were renewed efforts to reach an agreement as to how matters should be arranged between the commission company and the grain company. As indicated by memorandum "B," above copied, the Union Pacific Railway Company had previously delivered from its cars large amounts of grain to the grain company at the Union Elevator at Council Bluffs, without requiring the production or surrender of the bills of lading. There were outstanding on November 14, 1891, 129 bills of lading of this character. The grain represented by these bills of lading had either been shipped to some eastern market and sold, or was still in the possession of the Brown Bros. Grain Company. It was to hold harmless the railroad company with reference to this grain that the provisions in the memorandum "B" were made.

Memorandum "C" was made necessary by the following condition of affairs: There had been purchased in the regular course of business, by the agents of the Brown Bros. Grain Company running the elevators of that company in Kansas and Nebraska, a large amount of grain. It was the custom of these agents, as they purchased

grain, to draw on the grain company aforesaid through local banks for the amount of such purchases. The credits were extended to these agents by the local banks, largely, if not altogether, on the faith of the drafts, drawn against actual purchases. On the date of the mortgage and memorandum "C" there were outstanding unpaid drafts of this character to the aggregate amount of $16,-841.26. It cannot be determined from the evidence what proportion of the grain drawn against in this manner was in the elevators, and what proportion was on board cars. It was to make certain the payment of these outstanding drafts that the memorandum designated "C" was made.

It was in relation to the provisions of memorandum "A" that very much of the conflicting oral testimony was introduced. Briefly summarized, these conditions were that the P. Brockman Commission Company undertook to operate all the elevators which theretofore had been operated by the grain company, until such elevators should be disposed of by lease or sale to the advantage of the grain company, accounting meanwhile to said grain company for all profits "over and above all costs and expenses, interest, and all indebtedness for running the same." How from one standpoint this should be construed and supplemented was illustrated by the testimony of C. T. Brown, George K. Brown, and W. E. Kirker. Of these, C. T. Brown was the president of the Brown Bros. Grain Company. He testified that on the date of the mortgage he, with others, met Mr. Hall, the attorney for the P. Brockman Commission Company, and P. Brockman himself, at Mr. Hall's office in Omaha. As to what transpired at this office before the mortgage was executed this witness testified as follows: "The question of filing the mortgage was talked over and I said if the mortgage was filed it would probably ruin our business and our credit, and we did not want anything of that kind done, and Hall said, 'Either place the mortgage on file or take possession in order to make the mortgage good;' and I said that taking

possession and placing a notice on the buildings would
be as bad as filing the mortgage, and Hall said, 'You can
give possession with these elevators and formally turn
them over to him, and he can turn them back to you and
arrange with someone to take charge of them and no one
know anything about it;' and I said that I wanted a
written agreement as to how it should be run and who
was to have charge of it, and we talked the matter over
and the attorneys suggested that that could be done later
on, as we had not much time.   *   *   *   It was finally
agreed that the mortgage should not be recorded.   It was
agreed that the mere claim of formal possession should
be given to Brockman, instead of filing the mortgage, and
the business was to be run as it had been, without any
change.   He agreed there should be no change and I
should be the general manager of the business, but he
should pay the men, and possession was to be given him
and the business was to run as it had been.   *   *   *
Mr. Carstons was to represent Mr. Brockman in carrying
on the business." C. T. Brown further testified that the
memorandum designated above as "A" was "a part of the
result of the whole business and the only part of that
understanding that was decided was necessary to put
in writing; the rest of it was claimed to be matters that
could be arranged later on.   We insisted upon having
some agreement in writing, and this was made and the
rest was to be drawn afterwards; the details of running
the business were not yet to be put in writing, but drawn
in the contract there." Mr. Brown testified that the
mortgage and memoranda, above designated as "A," "B,"
and "C," were contemporaneously executed about 6
o'clock of Saturday evening.   It seems from the tes-
timony of all parties that on Sunday morning trouble
began between the contracting parties by the posting
of a notice of possession under the mortgage, and that
on Monday it increased and has since still further in-
creased, so that it resulted that the business was practi-
cally never continued.   We have not, therefore, the aid

of subsequent events to enable us to ascertain from the actual manner of running the business whether or not the above testimony was true. We can look alone to parol testimony in connection with the writings executed, and to the writings themselves, for information as to the scope and object of the transaction. The testimony of George K. Brown was as direct as was that of his brother, C. T. Brown, and to the same matters, and in addition thereto George K. Brown, who was secretary of the grain company, testified that on Sunday morning following the making of the mortgage he called on Mr. Brockman at the Paxton Hotel in Omaha to practically give him the formal possession; that witness asked Brockman if he had not better wait till Monday, as there was no time set, and was answered, "We had better take it to-day and we will be ready for business Monday," to which the witness replied that he was only one of the company, but would go and practically turn it over. This witness testified that practically turning over the office consisted in walking into the office and telling the bookkeeper and foreman of the elevator "that we practically turned the business over to Brockman, to operate the business as before, which I did." When those parties reached the office they found nailed to the door a notice, in the language of Mr. Brown, stating "that this property had been taken by Brockman, of St. Louis, under a chattel mortgage." Mr. Brockman denied that he had been instrumental in having this notice posted, and promised to see that it came down. George K. Brown, further testifying, said: "I think that Mr. Brockman was the man who spoke up and said things are going on as before, and I have a little interest here, and we want to keep everything quiet and not to say anything about the chattel mortgage on the property, as it was understood and agreed Brown is to manage the business as before, and that he would probably have a man there to represent him, which would be J. D. Carstons of Omaha, and I spoke to Brockman, as he went out, to have the notice

removed from the door, and he said, 'I'll see this is done.' "

Mr. Kirker, the treasurer of the Brown Bros. Grain Company, testified that he was present just before the mortgage was signed and asked Mr. Brockman about filing it, and was answered that it was not to be filed; that Brockman was to take formal possession, and, as Mr. Kirker said, "we were to run the business the same as it had been." This witness also testified that Mr. Brockman said he would furnish all the money necessary to run the business, and upon being asked to put that in writing he said, "Do you think I am a damned rascal?" and refused to comply.

In regard to the matters above referred to Mr. Brockman testified that after he came to Omaha in November, 1891, he investigated the matter, and as the Brown Bros. Grain Company owed him a great deal, he asked for security, either in the nature of a bill of sale or of a mortgage. In answer to an inquiry as to whether he made an agreement with the grain company for continuing its business when the mortgage was made, Mr. Brockman said in his testimony, "I think I agreed for them to carry on the business; that was before I knew how their financial standing was. They made all kinds of statements to me, which I found afterwards to be false; that they misrepresented everything to me, as I found out when I came to the various elevators." In answer to an interrogatory as to what understanding outside the written agreements he had with the Brown brothers, Mr. Brockman said: "I don't know that I had any particular agreement." Having admitted that he did not carry out his agreement with the grain company, Mr. Brockman responded to the question why this was, as follows: "After I took possession of the property of the various elevators, including the Council Bluffs elevator, and ascertained how much grain there was, I found that there was hardly any, perhaps a few car loads in the Council Bluffs elevator. I held at that time forty-three bills of lading for which there was

no grain. After ascertaining how I had been victimized and swindled by the Browns, who had obtained my money under false pretenses, I shut down on them only too quick, in order not to get in them any deeper, which would have been the case if I had continued business with them. For this reason I did not carry out this agreement, as, from their statements, the elevators were full. If I had found them so I would have carried out my agreement to the letter, but after I learned and found that they had swindled me in the matter, as I have stated before, I simply considered it my duty as a business man not to give them any chance to get into me any deeper. The bills of lading, which are in my possession yet, besides lots of other bills of lading, show where the grain has been diverted to, either Chicago or Milwaukee; all told there was over 100 car loads for which the Brown Bros. got paid twice, and in a good many instances they never even paid for the grain to the country shippers. They took out another bill of lading at Council Bluffs without surrendering the original ones, which were in possession of the various parties, some in banks, some in Chicago, some in Milwaukee, and those I held myself. By this *modus operandi* they not only swindled the various shippers, but the railroad company besides. For this reason I do not suppose that any sane man can blame me for not continuing the business in their name any longer, because it could not be done unless I had furnished them the money, and I even paid drafts for them, with bills of lading attached, to the amount of over $20,000." Upon this same subject-matter Mr. Brockman testified as follows:

Q. At the time you took possession of those elevators and other property, was there any understanding between you and the Brown Bros. Grain Company that they would still be the property of the Brown Bros. Grain Company?

A. No, sir.

Q. Or was there also any understanding that they should keep possession also with you?

A. I think there was somewhat of an agreement, the same as you read before, and for that reason I made this explanation giving the reason why I did not carry out this agreement.

On cross-examination, being asked if he meant to say that he had carried out his agreement (memorandum marked "A") to continue operating the elevators until they were disposed of, and as to continuing business with the Brown Bros. Grain Company, Mr. Brockman said: "I did intend to carry out that agreement at the time I signed it, and would have carried it out if I had found matters the way they were represented to me by the Browns."

Mr. Hall, who, as attorney, conducted the operations for Mr. Brockman at the time the mortgage was given, testified as follows:

"At the time the mortgage was given, at that interview or at the one leading up to it, the Brown Bros. Grain Company did not desire us to put our mortgage on record, and I think in the first interview, or one of the first, I told them, or it was said on our side, that it would not be necessary to put these mortgages on record at once; they were desirous of that afterward. At the time the mortgage was given I spoke of taking possession and they, the Brown Bros., whoever it was that conducted the conver- sation, I think it was Charley Brown, but it may have been one of the others, asked if we were going to take possession. I said, 'Yes, if we didn't record the mortgage, we would have to take possession;' and they then said that if we had to take possession, it didn't make much difference whether we recorded the mortgage or not; that was about the size of the talk, the substance of it."

Q. What, if anything, Mr. Hall, was said or done in these negotiations with regard to the control or running of the property?

A. Well, there was nothing in regard to control, except that he went into possession.

Q. Well, what was there, if anything, with reference to the preservation of it and disposition of it?

A. Well, they were, the Brown Bros. Grain Company, very much afraid, and so expressed themselves; said they were afraid that when we got this mortgage for the P. Brockman Commission Company, that we would immediately go to work and sell the elevator out and destroy the business. They said that they had an immense amount of grain coming in, and, to do that, would ruin the business. We said to them that if they had the grain coming in they said they had, it would not be to Brockman's advantage to destroy the business, nor to destroy or sell the elevators out at a sacrifice. They said, "Yes, but after you get this mortgage you may forget about that." Substantially the talk, and they wanted a writing that we would not sell it out at a sacrifice immediately, and, in fact, after that talk there was a writing given that told them that we did not propose unnecessarily to sacrifice the property. It was to our advantage to get as much for it as we could, and we intended to do that.

From the above quotations it is not left open to doubt that there was sufficient evidence from which it could properly be found that at the time the mortgage was made there was an understanding between the mortgagor and the mortgagee that the latter should take formal possession of the mortgaged property, and that it should, under the name of the latter, be run for the benefit of, and practically under the direction of, the mortgagor. By the terms of the mortgage itself it was provided that the mortgagee's right to take possession should be exercised upon the failure of the mortgagor to make payments of all or some portion of the amounts secured when it fell due. The property mortgaged was all the property of the mortgagor, and at the time the mortgage was given the mortgagor was insolvent. It is, however, insisted by the appellant that by the terms of memoranda "B" and "C" the mortgagee assumed, and has in fact assumed, certain obligations in consideration

of said mortgage, and in fact has performed some of these obligations at considerable cost, and that all these undertakings would have been carried out if the Brown Bros. Grain Company had not been guilty of such fraudulent conduct that the commission company ought not to be held to such performance. These were matters which concerned only the mortgagor and the mortgagee. In memorandum "B" the mortgagee recited, as one of the reasons for signing the memorandum, that the Union Pacific Railway Company had assisted the mortgagee in securing possession of the Union Elevator and in negotiating a proper transfer of the properties of the said Brown Bros. Grain Company for the purpose of securing the P. Brockman Commission Company, a consummation which, in this memorandum it was recited, was important to bring about, for the commission company, as was said in the memorandum, was a large creditor of the Brown Bros. Grain Company. As this memorandum was entered into solely for the benefit of the mortgagee and the Union Pacific Railway Company, and to the necessary disadvantage of all the other creditors of the Brown Bros. Grain Company, it is difficult to understand why any hardship sustained by the mortgagee should be chargeable to such other creditors. The agreement to protect certain drafts, to the amount of $16,800, was one intended solely for the benefit of the parties to it, and of the parties liable on the drafts. It was not for the benefit of the appellees in the remotest degree, and therefore it should not prejudice their rights. It is no concern of appellees whether or not the mortgagor or mortgagee aimed solely to secure an unjust advantage of each other in these dealings, and it is of as little consequence that, quarreling afterward, each still further sought to wrong the other, as is now freely charged by both parties. The question with which appellees are concerned is whether or not the transaction between the mortgagor and mortgagee on November 14, 1891, was of such a nature that thereby a secret trust was created in favor of the mort-

gagor to the prejudice of the rights of the appellees as creditors of the Brown Bros. Grain Company. Section 7, chapter 32, Compiled Statutes, provides: "All deeds of gift, all conveyances, and all transfers and assignments, verbal or written, of goods, chattels, or things in action, made in trust for the use of the person making the same, shall be void as against the creditors, existing or subsequent, of such person." By section 20 of the same chapter it is provided: "The question of fraudulent intent in all cases arising under the provisions of this chapter shall be deemed a question of fact and not of law," etc. It has been repeatedly held by this court that the question of fraudulent intent is one to be determined by the jury, in a case where there is a jury, and by the court as a question of fact where there is no jury. (*Kilpatrick-Koch Dry Goods Co. v. McPheely*, 37 Neb., 800; *Hewitt v. Commercial Banking Co.*, 40 Neb., 820; *Meyer v. Union Bag & Paper Co.*, 41 Neb., 67; *Connelly v. Edgerton*, 22 Neb., 82; *Davis v. Scott*, 22 Neb., 154; *Riley v. Melquist*, 23 Neb., 474; *Fitzgerald v. Meyer*, 25 Neb., 77; *Feder v. Solomon*, 26 Neb., 266.) The district court, upon conflicting proofs evidently, found that there was a fraudulent intent entertained by both parties to the mortgage at the time it was made, and this it could very properly do, in view of evidence in relation to the existence of a secret trust relation between them under the circumstances disclosed by the proofs. There were also justified findings that the mortgagor was insolvent, that the appellees were existing creditors of the mortgagor, and that if such mortgage was sustained the appellees would be wholly prevented from collecting their claims as against the mortgagor. In terms, these findings were not expressed at length in the decree, but they were the necessary inferences from findings that the averments of the petitions which alleged these facts were true. It requires no citations in support of the proposition that the findings of the district court upon conflicting evidence will not be

disturbed on appeal. It therefore results that the judgment of the district court is

AFFIRMED.